UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Ashlie Jane Emery,

      Plaintiff,

      v.                                Civil Action No. 2:11-CV-248

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 8, 11)

Plaintiff Ashlie Emery brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI"). Pending before the Court

are Emery's Motion for Order Reversing the Commissioner's Decision (Doc. 8) and the

Commissioner's Motion for Order Affirming the Commissioner's Decision (Doc. 11).

For the reasons stated below, the Court DENIES Plaintiff's Motion, and GRANTS the

Commissioner's Motion.

## Background

Emery was twenty-four years old on the alleged disability onset date of

May 18, 2009. (AR 37, 152.) She completed high school and has taken online college

courses in pursuit of an associate's degree in business. (AR 40, 233.) She has held

positions as a fast-food worker, a crew chief at a McDonald's restaurant, and a dietary aide at a nursing home.  (AR 41, 223.)

In July and September 2009, respectively, Emery filed DIB and SSI applications. (AR 147, 152.)  In support of her DIB application, Emery asserts that, beginning on September 1, 2008, she has been unable to work due to anxiety disorder, bipolar disorder, posttraumatic stress disorder ("PTSD"), obsessive compulsive disorder, insomnia, migraine headaches, nausea, irritable bowel syndrome ("IBS"), and carpal tunnel syndrome, among other ailments.  (AR 52, 222.)  Emery's application was denied initially and on reconsideration.  (AR 65-92.)  On February 14, 2011, Emery amended her alleged disability onset date to May 18, 2009.  (AR 282.)

On February 15, 2011, Administrative Law Judge ("ALJ") Robert Klingebiel conducted a hearing on Emery's application.  (AR 33-64.)  At the hearing, Emery was represented by counsel and testified on her own behalf.  (AR 35.)  On March 16, 2011, the ALJ issued a decision finding Emery not disabled under the Social Security Act.  (AR 15-27.)  The Appeals Council subsequently denied Emery's request for review.  (AR 1-3.)  Having exhausted her administrative remedies, Emery filed a Complaint in this action on October 14, 2011.  (*See* Doc. 3.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity" ("SGA").  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not

so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step commands that the ALJ determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, the ALJ first determined that Emery had not engaged in SGA since her alleged disability onset date. (AR 18.) Next, the ALJ found that Emery had the severe impairments of bipolar disorder, generalized anxiety disorder, fibromyalgia, IBS, and obesity. (*Id.*) The ALJ found, however, that Emery's carpal tunnel syndrome and asthma were not severe impairments. (AR 19.) Proceeding to step

three, the ALJ found that Emery did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id*.) The ALJ then determined that Emery had the RFC to perform "medium work," so long as she was limited to "simple instructions and tasks," had "the ability to periodically alternate sitting and standing," and "avoid[ed] waiting on the public." (AR 21.) Finally, after noting that she had no past relevant work, the ALJ determined that there were jobs existing in significant numbers in the national economy that Emery could perform based on her age, education, work experience, and RFC. (AR 25.) Thus, the ALJ concluded that Emery had not been under a disability since her alleged disability onset date of May 18, 2009. (AR 26.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any SGA by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct

legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is restricted to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role in reviewing the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded [that] decision," *Hernandez v. Barnhart*, No. 05-9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (internal quotation marks omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

### I.    Credibility Determination

Emery claims that the ALJ's credibility determination is not supported by substantial evidence. (Doc. 8-1 at 9-12.) It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant."

*Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal

quotation marks omitted). "When evaluating the credibility of an individual's statements,

the adjudicator must consider the entire case record and give specific reasons for the

weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July

2, 1996).

Here, the ALJ found that Emery's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, [Emery's] statements

concerning the intensity, persistence and limiting effects of these symptoms are not

credible to the extent they are inconsistent with the evidentiary record as well as the

above [RFC]." (AR 23.) Prior to making this finding, the ALJ accurately summarized

Emery's self-reported limited functionality, citing for example her alleged difficulty

sleeping, talking to others, and leaving her house alone, as well as her alleged "inhibited

memory and inability to concentrate, understand and follow directions as well as

complete tasks." (AR 22 (citing AR 237-38, 258).) The ALJ explained, however, that

Emery's reported daily activities contradicted these alleged impairments. (AR 22.) The

ALJ discussed Emery's ability to leave her house by herself to run errands, attend

medical appointments, and transport her children to and from preschool and daycare.

(AR 24 (citing AR 233, 253-54, 416, 528, 548, 565, 589).) Notably, Emery herself stated

in a Function Report that she "tend[ed] to overspend when spending too much time in

stores," thus admitting that she was able to leave her house, apparently for extended

periods, to go shopping. (AR 236.) Regarding Emery's claimed difficulty concentrating,

the ALJ accurately noted that Emery was able to write poetry and do college-level

schoolwork, which activities would seem to require a high degree of concentration.  (AR 23 (citing AR 233, 257).)  Also noteworthy, Emery stated in her Function Report that she was able to pay bills, handle a savings account, and use checkbooks/money orders, also activities that require a fair amount of concentration.  (AR 236.)

In determining that Emery was not entirely credible, the ALJ also cited the opinions of non-examining agency consultants Drs. Thomas Reilly and William Farrell. (AR 24.)  Both doctors stated that, "[a]lthough [Emery] reports inability to leave her home unescorted, in fact [she] does this on a daily basis and is noted to run errands [and] deliver and pick-up her children[,] and appears to attend medical app[ointments] alone." (AR 416, 565.)  Based on this contradiction, Drs. Reilly and Farrell opined that "[w]hile some discomfort is likely given [Emery's] chronic anxiety, the degree of severity and associated limitation appears overstated."  (*Id.*)

Emery argues that the consistent opinions of her treating doctors support her statements regarding the severity of her symptoms.  (Doc. 8-1 at 9-12.)  She specifically cites a Psychiatric Evaluation from her first visit with psychiatrist Dr. Louis Frank in June 2009 that includes a Global Assessment of Functioning ("GAF") score of "45/50" (*Id.* at 10 (citing AR 548)), indicating "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000).  A review of Dr. Frank's progress notes, however, reveals that much of Emery's psychiatric treatment with Dr. Frank was based on her own self-reporting of

symptoms.  (*See, e.g.,* AR 548, 705-11.)  Although a court may not reject medical evidence solely because it relies on a claimant's own subjective accounts, *see Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003), neither may a court adopt such evidence without considering whether the claimant's reported symptoms are credible, *see Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (medical opinion premised on subjective complaints may be disregarded where record supports ALJ in discounting claimant's credibility); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999) (physician's opinion premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where subjective complaints have been properly discounted).  In any event, the ALJ was not required to rely on Dr. Frank's opinion in determining whether Emery was credible, given that the ALJ properly afforded little weight to this opinion, as discussed in detail below.

Furthermore, Dr. Frank's progress records indicate that the severity of Emery's symptoms improved throughout the course of treatment.  For example, despite assigning Emery a GAF score of "45/50" in June 2009 (AR 548), Dr. Frank wrote on April 4, 2010 that Emery's "overall clinical condition has improved" (AR 708).  And on August 5, 2010, Dr. Frank observed "no discernable [symptoms]."  (AR 707.)  Similarly, on October 21, 2010, Dr. Frank noted that Emery "report[ed] no symptoms and [wa]s clinically stable."  (AR 706.)  Several months later, in a mental assessment "Questionnaire" dated February 22, 2011, Dr. Frank stated that Emery's "[p]rognosis [wa]s good so long as [she] continue[d] treatment."  (AR 701.)

The Court finds the ALJ applied the correct legal standard in assessing Emery's credibility, and substantial evidence – including the opinions of multiple non-examining agency medical consultants and Emery's self-reported daily activities – supports the ALJ's credibility determination.

## II.     Analysis of Treating Provider Opinions

Emery claims that the ALJ erred in his analysis of the treating physicians' opinions. (Doc. 8-1 at 4-8.) Specifically, she asserts that the opinions of Dr. Frank and Dr. Fay Homan support a finding of disability and are consistent with the record evidence, particularly the opinion of treating therapist Dean Corcoran, LMHC, LADC.

"With respect to the nature and severity of [a claimant's] impairment(s) . . . [t]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citations omitted); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Despite this rule, treating physician opinions "need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). It is well settled that the conflicting opinions of other medical experts, including consultative physicians, "may constitute such [substantial] evidence." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Emery argues that the ALJ failed to consider the factors relevant to assigning weight to the opinions of Drs. Frank and Homan. (Doc. 8-1 at 6.) If "[a]n ALJ . . .

refuses to accord controlling weight to the medical opinion of a treating physician," she "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhary*, 362 F.3d at 32. "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.*; 20 C.F.R. § 404.1527(c)(2).

### A. Dr. Homan

In May 2009, Dr. Homan began treating Emery for general anxiety and inability to sleep. (AR 337.) On June 16, 2009, Emery saw Dr. Homan "to discuss her disability paperwork." (*Id.*) Emery reported that she "ha[d] been fired from multiple jobs because she 'doesn't like people telling her what to do,'" and Dr. Homan assessed a "[l]ong-standing multifactorial psychological disturbance with symptoms suggestive of bipolar and generalized anxiety disorder." (*Id.*) Dr. Homan noted Emery's upcoming initial appointment with Dr. Frank and stated that she "welcome[d] his expertise on medications." (*Id.*) Approximately one month later, Dr. Homan recorded that Dr. Frank had reported to her that Emery had not tolerated a particular medication but was "doing quite well with no medications," and thus Dr. Frank "favor[ed] not treating [Emery] at th[at] time." (AR 338.) On October 1, 2009, Dr. Homan observed that Emery's "[a]ffect is full range and eye contact is good," and stated that Emery's "[s]ymptoms [are] consistent with fibromyalgia, although there is significant overlap of her psych issues."

(AR 409.)  Dr. Homan also noted that Emery was "making some slow improvements." (*Id.*)  Later that month, Dr. Homan stated that Emery was "slowly improving from her gastroenteritis," and that, although her anxiety was "still quite prominent," it was "[s]table" and she demonstrated "[n]o acute distress."  (AR 530.)  Dr. Homan continued seeing Emery throughout the year 2010, treating her for various ailments including chronic headache, fatigue, and IBS.  (AR 583, 585-86.)  On July 26, 2010, Emery visited Dr. Homan for preconception counseling.  (AR 587.)  Emery told Dr. Homan that she "would like to get pregnant," and reported "being in a strong supportive relationship for the last several years and feel[ing] ready for another child."  (*Id.*)

In December 2010, Dr. Homan provided an assessment of Emery's physical ability to do work.  (AR 669.)  Therein, Dr. Homan opined that Emery's impairments did not affect her ability to lift, carry, stand, walk, or sit.  (*Id.*)  In an attached letter, however, Dr. Homan stated that Emery's "primary difficulty with maintaining employment is her depression."  (AR 668.)  Dr. Homan explained that Emery's anxiety and depression "were so bad that she felt unable to leave the house," and that these conditions "significantly impact [Emery's] day-to-day living."  (*Id.*)  Dr. Homan further stated that, despite being on three psychoactive medications, Emery was still experiencing "incapacitating flares of depression and anxiety."  (*Id.*)  Additionally, Dr. Homan noted that Emery's abdominal and pelvic pain was "fluctuating," and that, "at its worse, [the pain] [wa]s intense and would impair regular job performance."  (*Id.*)  Dr. Homan concluded that Emery's combination of mental and physical issues "impair her ability to hold a full-time job at this time . . . [and] for at least the next year."  (*Id.*)

The ALJ assigned "little weight" to Dr. Homan's opinion regarding Emery's mental impairments, explaining that Dr. Homan was not a specialist in the area of psychology and had not treated Emery's mental ailments. (AR 25.) As such, the ALJ properly based his decision on two of the four applicable regulatory factors – the "[n]ature and extent of the treatment relationship" and whether the opinion was "of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(2)(i), (5). The ALJ did not err in failing to consider every regulatory factor, as the law is clear that an ALJ need not explicitly consider and discuss every factor in each case. *See* SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006) ("Not every factor for weighing opinion evidence will apply in every case . . . . Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case."). The ALJ was correct that Dr. Homan is not a psychiatrist. (*See* AR 337.) Furthermore, Dr. Homan's reports reveal that she did not treat Emery for her mental impairments. As discussed above, at an early stage in Dr. Homan's treatment of Emery, Dr. Homan "agree[d] with [Emery's] plan of a referral to Dr. Frank . . ., which was recommended by [Emery's] local counselor," and "welcome[d] [Dr. Frank's] expertise on medications." (*Id.*) Thereafter, although Dr. Homan often recorded Emery's psychiatric treatment, it was with reference to her treatment with Dr. Frank and therapist Dean Corcoran. (*See, e.g.,* AR 338, 409, 411, 536, 583, 586-87.)

Furthermore, as pointed out by the Commissioner, Dr. Homan failed to identify any specific limitations arising from Emery's impairments, instead giving a somewhat

conclusory opinion that "'[Emery's] combination of both psychiatric issues and pelvic pain impair her ability to hold a full-time job.'" (Doc. 11 at 18 (quoting AR 668).) The regulations "are abundantly clear that only the Commissioner may determine whether a claimant is disabled or unable to work." *Jones v. Astrue*, No. 09 Civ. 5577(DAB)(FM), 2011 WL 3423771, at *17 (S.D.N.Y. Jul. 15, 2011); *see Snell v. Apfel*, 177 F.3d 128, 133-34 (2d Cir. 1999) ("The final question of disability is . . . expressly reserved to the Commissioner."). Specifically, the regulations provide that "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that we will determine that you are disabled," because this is an "administrative finding[] that [is] dispositive of [the] case," and thus is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1). Thus the ALJ was not obligated to afford significant weight to Dr. Homan's conclusory opinion that Emery's impairments limited "her ability to hold a full-time job." (AR 668.)

For these reasons, the ALJ did not err in assigning little weight to Dr. Homan's opinion.

### B.    Dr. Frank

Psychiatrist Dr. Frank treated Emery's depression, PTSD, and anxiety from June 23, 2009 until January 4, 2011, prescribing Ativan, Lexapro, and Neurontin at various times during that period. (AR 699, 708-09, 711.) On April 4, 2010, Dr. Frank observed that Emery's "[m]ood/overall clinical condition has improved," and that she "reports [a] decrease in anxiety episodes." (AR 708.) On August 5, 2010, Dr. Frank recorded that Emery's mood was "neutral," that she was no longer taking medication

"[with] no discernible [symptoms] noted," and that she was trying to conceive a child.

(AR 707.) Dr. Frank wrote that the "[p]lan is to monitor [Emery] for any symptom

recurrence, and then evaluate [the] need for medication." (*Id.*) The following month,

however, Emery reported to Dr. Frank that she was having "ongoing anxiety [and]

recurring periods of depressed mood." (AR 706.) Noting that Emery's mood was

"neutral to slightly depressed," Dr. Frank again prescribed Ativan, Lexapro, and

Neurontin. (*Id.*) Approximately one month later, in October 2010, Dr. Frank recorded

that Emery's mood was "euthymic," and she "reports no symptoms and is clinically

stable." (*Id.*) Dr. Frank also noted that Emery was using Ativan "only RARELY [as

needed], <u>IF</u> anxiety occurs." (*Id.*)

On February 22, 2011, Dr. Frank completed a "Questionnaire" and "Assessment

of Ability to Do Work-Related Activities (Mental)." (AR 699-704.) As noted above, in

the Questionnaire, Dr. Frank stated that Emery was "on several medications," and opined

that her "[p]rognosis is good so long as [she] continues treatment." (AR 701.) Dr. Frank

also opined that Emery was "moderate[ly]" restricted in her activities of daily living,

"marked[ly]" limited in her ability to maintain social functioning, and "marked[ly]"

limited in her ability to complete tasks in a timely manner as a result of her deficiencies

in concentration, persistence, or pace. (AR 700.) In the mental assessment, Dr. Frank

opined that Emery had "marked" limitation in dealing with the public and work stress,

"moderate" limitation in responding appropriately to usual work situations and

maintaining attention/concentration, and "slight" limitation in functioning independently.

(AR 702.) Dr. Frank stated that he was unable to accurately assess Emery's ability to

respond appropriately to co-workers, supervision, and changes in a routine work setting; and demonstrate reliability. (AR 702-03.) He also stated that he could not accurately determine how many days per month Emery would be expected to miss work due to her impairments. (AR 704.)

Despite acknowledging Dr. Frank's specialization as a psychiatrist, as well as the length of his treating relationship with Emery, the ALJ afforded only "limited weight" to Dr. Frank's opinion. (AR 24.) The ALJ explained that the opinion was "only partially consistent with the evidentiary record," and was inconsistent with the opinions of non-examining agency consultants Drs. Reilly and Farrell. (*Id.*) The Court agrees that Dr. Frank's opinion is not entirely consistent with the evidentiary record, which reveals that, although Emery experienced difficulties dealing with the public[1], she was not markedly limited in her ability to maintain social functioning and complete tasks in a timely manner. Specifically, the record demonstrates that, during the alleged disability period, Emery was a "single parent[]" to her two young children (AR 337), attended online college courses for several hours each day (AR 337), and wrote poetry "almost every day" (AR 257).

It was appropriate for the ALJ to consider whether Dr. Frank's opinion was consistent with the opinions of the agency consultants and Emery's daily activities. *See Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (treating physician's opinion was not entitled to controlling weight where it was at odds with other medical opinions and

---

[1] The ALJ accounted for Emery's problems dealing with the public in his RFC determination, limiting Emery to jobs which would allow her to "avoid waiting on the public." (AR 21.)

conflicted with claimant's testimony concerning his daily activities); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating physician's opinion was not entitled to extra weight where it was contradicted by the opinions of several medical experts, including two consultative psychologists); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts").  The regulations state: "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

The ALJ gave "great weight" to the opinions of agency consultants and psychologists Drs. Reilly and Farrell (AR 23), who opined that Emery was able to understand and remember "routine 1-3 step . . . instructions in low stress contexts"; could maintain concentration, attendance, and pace to perform routine, one-to-three-step tasks "w[ith] episodic disruption . . . during periods of increased stress[]"; and would best perform "in contexts w[ith]out intense demands for social interaction" (AR 416, 565). The ALJ reasonably explained his decision as follows:

> Dr. Reilly and Dr. Farrell note that although [Emery] has alleged obsessive-compulsive behaviors, she has not reported these symptoms to her treating providers.  They further opine that [Emery's] allegations of panic attacks and agoraphobia are inconsistent with her demonstrated abilities.  [Emery] alleges the inability to leave her home unescorted; however, she reports the ability to transport her children to and from pre-school and daycare as well as run errands.  Additionally, they note that [Emery] has attended her medical appointments by herself.

(AR 23-24 (internal citation omitted).)  The ALJ's analysis of the opinions of Drs. Reilly and Farrell was proper.  Moreover, the record supports the opinions of these consultants.

First, as stated by the ALJ, "[Emery's] reported daily activities demonstrate her ability to function in daily life . . . ."  (AR 22.)  Specifically, as noted above, the record demonstrates that Emery's regular activities included caring for her children, doing household chores, preparing meals, running errands, completing college-level coursework, and writing poetry.  (AR 22-23.)  Second, Emery's mental examinations yielded mostly normal results throughout the alleged disability period.  Since Emery began treating with Dr. Frank, she was described as alert and cognitively intact, with neutral/normal mood and adequate insight and judgment.  (*See, e.g.,* AR 549, 552, 705-09.)  In August 2010, Emery stopped taking psychiatric medications as she wanted to become pregnant (AR 707, 711), and told Dr. Homan that she was "in a strong supportive relationship for the last several years" and was "ready for another child" (AR 587).  Her mood was described as "neutral," and Dr. Frank stated that she exhibited "no discernible [symptoms]."  (AR 707.)  Although Emery appears to have suffered a deterioration in her mental condition in September 2010, her mood was still described as merely "neutral to slightly depressed."  (AR 706.)  Less than one month later, she was described as "euthymic" and "report[ing] no symptoms."  (*Id.*)

Emery contends that the ALJ erred in affording significant weight to the agency consultant opinions, stating that "opinions of non[-]examining medical sources are valid only to the extent they are grounded in evidence from examining medical providers." (Doc. 8-1 at 14.)  Emery cites no law to support this proposition.  In fact, as this Court

stated in *Plante v. Astrue*, No. 2:11-CV-77, 2011 WL 6180049, at *8 (D. Vt. Dec. 13, 2011), "[a]lthough in many cases it is most appropriate for ALJs to give less weight to the opinions of non-examining agency consultants than to those of treating physicians and other treating providers, this determination must be made on a case-by-case basis, and the regulations clearly permit the opinions of non-examining agency consultants to override those of treating sources, when the former are supported by evidence in the record and the latter are not." *Id.* (citing SSR 96-6p, 1996 WL 374180, at *3 (1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.")). In this case, as in *Plante*, for the reasons stated above, the Court finds that it was proper for the ALJ to give more weight to the opinions of agency consultants Drs. Reilly and Farrell than to those of Emery's treating providers.

Another proper justification provided by the ALJ for affording only limited weight to Dr. Frank's opinion is that there are several internal inconsistencies contained therein, including: (a) Dr. Frank's statement that Emery had marked restrictions in social function, versus his statement that he could not accurately assess Emery's ability to respond appropriately to co-workers or supervision; and (b) Dr. Frank's statement that Emery was only slightly limited in her ability to function independently, versus his statement that Emery was moderately limited in her ability to complete activities of daily living. (AR 24 (citing AR 700, 702).) The ALJ also accurately noted that Dr. Frank's

opinion that Emery had marked limitation in maintaining attention and concentration was "not supported" by Emery's "reports of performing schoolwork for three hours at a time and writing poetry for one hour at a time." (*Id.* (citing AR 233, 257).)

It was appropriate for the ALJ to consider whether Dr. Frank's opinion was internally consistent, as the Second Circuit has held that a physician's opinion is given less weight when those opinions are internally inconsistent. *See, e.g., Michels v. Astrue*, 297 F. App'x 74, 75-76 (2d Cir. 2008) ("Given the inconsistencies here, the ALJ was free to discount Dr. Bogner's opinions in favor of a broader view of the medical evidence, notwithstanding Bogner's status as the 'treating physician.'"). Emery maintains that, given the ALJ's finding that Dr. Frank's opinion was internally inconsistent, the ALJ "was required to seek clarification . . . [of the] perceived inconsistency." (Doc. 8-1 at 6.) An ALJ has a general affirmative obligation to develop the administrative record, and a particular duty to seek additional information from a treating physician when the physician's clinical findings are "inadequate." *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). In other words, the ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative records." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). But "[t]he mere fact that there is an inconsistency in a treating physician's opinion does not trigger a duty to re[-]contact a physician, provided there is sufficient evidence from which to ascertain what weight an opinion is due." *Williams v. Astrue*, No. 10-CV-499S, 2012 WL 1114052, at *4 (W.D.N.Y. Mar. 30, 2012).

Here, there is no gap or inadequacy in the administrative record; Dr. Frank's progress notes from his treatment of Emery (AR 705-11), coupled with the other medical treatment notes and opinions as well as Emery's self-reported daily activities, are more than adequate. Furthermore, Emery points to no particular evidence that is missing from Dr. Frank's treatment notes. In this context, courts have acknowledged the distinction between a "gap" in the record and an opinion that is simply unsupported by substantial evidence. *See Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *20 (E.D.N.Y. Aug. 14, 2012) ("There was no 'gap' in the record; rather, there was an absence of evidence of neurological deficits and a corresponding lack of meaningful clinical markers of total disability. Consequently, the ALJ was not required to seek additional information."). Only if a clear gap exists, is the ALJ required to develop the administrative record. *See Rosa v. Callahan*, 168 F.3d at 79. Because there was no gap in the record here, the ALJ was not required to seek more information from Dr. Frank.

Also noteworthy, Dr. Frank's opinion is given on a fill-in-the-blank-type form, and is accompanied by little explanation. (AR 699-704.) *See Halloran v. Barnhart*, 362 F.3d at 31 n.2 (noting that "standardized form[s]" are "only marginally useful for purposes of creating a meaningful and reviewable factual record"). The only possible explanations provided in Dr. Frank's Questionnaire and mental assessment are the diagnoses of "mood disorder secondary to chronic pain/PTSD/atypical depression," and Dr. Frank's statement that these diagnoses were "assessed by interview/patient symptoms." (AR 699.) As previously discussed, however, the ALJ found that Emery's statements concerning the intensity, persistence, and limiting effects of her symptoms

were "not credible." (AR 23.)  Thus, to the extent that Dr. Frank's opinion was based on Emery's reported symptoms, the opinion is deficient.  Moreover, as stated above, Dr. Frank admitted throughout the form that he was unable to accurately predict whether certain aspects of Emery's functionality would be impacted by her impairments.  Most notably, Dr. Frank stated that he could not determine with accuracy the number of work days Emery would be expected to miss each month due to her impairments.  (AR 704.)

In sum, the ALJ did not err in his analysis of Dr. Frank's opinion, given that (a) he adequately explained his decision to afford only limited weight to that opinion, and (b) that decision is supported by the opinions of agency consultants Drs. Reilly and Farrell, Emery's activity level, and the medical evidence.

### C.  Therapist Corcoran

Emery claims that the ALJ failed to properly analyze the opinion of her treating therapist, Dean Corcoran, LMHC, LADC.  (Doc. 8-1 at 4.)  Emery asserts that Corcoran was the treating provider most familiar with her symptoms, and that Corcoran's opinion is consistent with other medical evidence, including the opinions of treating physicians Drs. Homan and Frank.  (*Id.*)

In a February 2011 letter to Emery's attorney, Corcoran stated that Emery "is extremely self-conscious and freezes up in social situations," and suffers from "panic and agoraphobia attacks."  (AR 698.)  Explaining that during these panic and agoraphobia attacks, Emery "loses the ability to concentrate [and] stays isolated in her home."  (*Id.*)  Corcoran stated that he "can't imagine an employer being willing or able to [tolerate Emery's] short notice absenteeism," and opined that Emery "would be unable[,] even if

she managed to make it out of the house[,] to function in an emotionally stable way in a work situation." (*Id.*) The February 2011 letter indicates that Corcoran's opinion is based on his observations of and conversations with Emery during treatment, as well as on Emery's frequent absence at appointments "due to panic and agoraphobia attacks that [often] don't seem . . . to have triggers." (*Id.*)

After accurately summarizing Corcoran's opinion, the ALJ gave "little weight" thereto, stating that Emery "has demonstrated her ability to maintain interpersonal relationships." (AR 24.) The ALJ explained: "July 2010 medical records note that [Emery] was in a strong, supportive relationship for the last several years. She reported feeling ready for another child [and] subsequently discontinued her Lexapro, Ativan[,] and Gabapentin to prepare for a possible pregnancy." (*Id.* (citing AR 587).) Moreover, as noted above, the ALJ found that Emery's ability to take college-level courses and write poetry was inconsistent with medical opinions that she would be unable to concentrate. (AR 23 (citing AR 233, 257).) Furthermore, in contrast with Corcoran's opinion that Emery would be unable to work due to frequent absenteeism, the ALJ found that Emery was able to maintain a regular schedule and leave her house unescorted based on her self-reported ability to bring her children to school, run errands, and attend medical appointments. (AR 24; *see* AR 233, 253-54, 416, 528, 548, 565, 589.) Emery's ability to do these activities supports the ALJ's decision to give little weight to Corcoran's opinion.

The ALJ also properly noted that, although Corcoran "is not considered . . . an 'acceptable medical source' for purposes of establishing [Emery's] impairments, his

opinions may be used as evidence to assess the severity of [Emery's] impairments and how they affect her ability to work." (AR 24.) ALJs are not required to afford the same level of deference to the opinions of "other sources," including therapists like Corcoran, as they are to the opinions of "acceptable medical sources," including licensed physicians. *See* 20 C.F.R. § 404.1513(a), (d); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("Information from . . . 'other sources' cannot establish the existence of a medically determinable impairment . . .[;] there must be evidence from an 'acceptable medical source' for this purpose."). The Second Circuit explained that, "while the ALJ is certainly free to consider the opinions of . . . 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (citation omitted). Applied here, the ALJ was free to discount the opinion of Corcoran in favor of the opinions of consulting psychologists Drs. Reilly and Farrell.

Emery asserts that Corcoran's opinion is consistent with the opinions of treating physicians Drs. Frank and Homan. (Doc. 8-1 at 4-5.) Specifically, Emery notes that these treating physicians opined, like Corcoran, that Emery would have a high rate of absenteeism due to her anxiety and depression. (*Id.*) But in fact, only Corcoran opined that Emery would be repeatedly and unpredictably absent from work. (AR 698.) Dr. Frank stated that he could not determine with accuracy how many days each month Emery would be expected to miss work as a result of her impairments. (AR 704.) And although Dr. Homan stated that Emery "was fired from her [nursing home aide] job due

to poor attendance which occurred because of days when her anxiety and depression were so bad that she felt unable to leave the house" (AR 668), this fact is not accurate. During the administrative hearing, Emery testified that she lost her nursing home aide job because of poor attendance, but explained that this poor attendance was due in part to her need to care for her infant son who was frequently sick. (AR 43-44.) Upon questioning, Emery specified that her anxiety caused her to miss work only "[a] couple of times a month." (AR 44.)

Accordingly, the ALJ did not err in his analysis of Corcoran's opinion. Rather, the ALJ properly considered Corcoran's opinion, and gave adequate reasons for his decision to afford little weight thereto. *See* SSR 06-03p, 2006 WL 2329939, at *6.

### Conclusion

For these reasons, the Court finds that the ALJ's credibility assessment and analysis of the medical opinions was proper, and that the ALJ's determination that Emery was not disabled is supported by substantial evidence. Therefore, the Court DENIES Emery's motion (Doc. 8), GRANTS the Commissioner's motion (Doc. 11), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 15th day of October, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge